# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF PUERTO RICO

IN RE:

**CHASE MONARCH INTERNATIONAL INC**

    **Debtor(s)**

CASE NO. 17-06841 BKT

CHAPTER

**FILED & ENTERED ON 01/24/2018**

## OPINION & ORDER

Before the court is creditor Cherif Medawar's (hereinafter "Mr. Medawar" or "Landlord") *Urgent Motion for Immediate Surrender of Premises* [Dkt. No. 7]; Debtor, Chase Monarch International, Incorporated's, (hereinafter "Tenant" or "Debtor") *Debtor's Response Opposing the Urgent Motion for Immediate Surrender of Premises* [Dkt. No. 26]; Mr. Medawar's *Reply to Debtor's Response Opposing the Urgent Motion for Immediate Surrender of the Premises* [Dkt. No. 40]; Debtor's *Sur Reply to Urgent Motion for Immediate Surrender of the Premises* [Dkt. No. 53]; and Mr. Medawar's *Motion in Support of Urgent Request for Hearing Regarding the Urgent Motion for Immediate Surrender of Premises* [Dkt. No. 79]. After reviewing the documents provided by the parties and for the reasons set forth below, Mr. Medawar's *Motion in Support of Urgent Request for Hearing Regarding the Urgent Motion for Immediate Surrender of Premises* [Dkt. No. 79] is DENIED as to the hearing requested. Mr. Medawar's *Urgent Motion for Immediate Surrender of Premises* [Dkt. No. 7], is GRANTED.

## FACTS

The court finds the following facts undisputed.

1.    On September 5, 2017, Debtor and Mr. Medawar executed a Lease Contract Agreement with Option to Purchase (hereinafter "Lease") with Debtor.[1]

2.    In numbered paragraph 2, the Lease states in relevant part:

> 2. Landlord hereby leases the Premises to Tenant, (with an option to purchase —see paragraph 19) for an initial "first term" from September 1, 2017 to August 31, 2019. **Lease payments shall commence on September 1, 2017 with a discounted net monthly rent payment in the amount of $7,000.00 until December 31, 2017.** This discount is extended in an effort to reduce Tenant's expense in taking over the possession of the property with any staffing, training, repair, maintenance or additional needs and expenses. Then, from January 1, 2018 forward, the net monthly rent shall be $12,000 until August 31, 2019. (Emphasis ours)

3.    In numbered paragraph 4, the Lease states as follows:

> 4. At the signing of this lease agreement, Tenant shall deliver to Landlord the amount of $19,000, to represent $7,000 for the rental payment for the month of September of 2017, and $12,000 as a rental deposit. The deposit shall be held by the Landlord, and shall be refunded without interest on the day Tenant delivers the premises to Landlord pursuant to the contract and after the property has been returned to the Landlord, assuming there are no damages done to the property, furniture or appliances other than normal wear and tear and evidence of utility bills being paid in full, there are no outstanding monthly rents and all rents have been on time in advance.
>
> .…**Tenant shall not use the Security Deposit in lieu or as an advance of payment of rent.** (Emphasis ours)

4.    In the first numbered paragraph 5, the Lease states in relevant part:

> 5. Afterwards: Rent in the amount stipulated in paragraph 2 of this Agreement starting on October 1, 2017 shall be deposited in advance on or before the first day of each month, excluding weekends and holidays, whereby the rent amount shall be deposited on the next business day to the Landlord's bank account…. A late fee of $100 per day shall apply to the rent if check is returned due to insufficient funds or rent is deposited after the 5th day of the month, excluding weekends and Holidays, in which case, the rent amount shall be deposited on the next business day. The $100 daily late fee shall not exceed 10 days ($1,000). **On the 11th day Landlord shall have the right to terminate the lease and**

---

[1] In addition to Mr. Medawar, his spouse, Maria Teresa Galaz Lozano was also a signatory to the Lease as the "Landlord". However, Ms. Galaz Lozano is not a movant in this action.

**take over the property without further notices.** No more than two late payments are allowed in any twelve months period. (Emphasis ours)

5.   In numbered paragraph 7, the Lease states in relevant part:

7. Default: If Tenant breaches any of the obligations arising out of this contract or violates any of its conditions, **the landlord may terminate this contract immediately after Seven (7) calendar-days written notice to cure to Tenant….Notice shall be given to Tenant or Landlord, by means of letter or email to the addresses specified below at the signature part of this document**…." (Emphasis ours)

6.   The last two pages of the Lease indicate the email address of the Tenant to be ChaseMonarchIntl@gmail.com, and the physical address is listed as:  250 Cristo Street, OSJ PR 00901.

7.   On October 23, 2017, Mr. Medawar sent an email to the Tenant's email address, as stated in the Lease, indicating that the October 2017 rent payment had not been received and requesting that Debtor deliver the rent payment on that date.

8.   On October 31, 2017, eight (8) calendar days after the email described above was sent to Debtor, a letter was sent by a legal representative of Mr. Medawar in effect terminating the Lease for Tenants " due to tenant's noncompliance with the terms of the same…."[2]

9.   On November 14, 2017, Debtor filed its bankruptcy petition under chapter 11 of the Code.

### LEGAL ANALYSIS

11 U.S.C. § 541(b)(2)states:

(b)Property of the estate **does not include**—

...

(2) any interest of the debtor as a lessee under a lease of nonresidential real property that has **terminated at the expiration of the stated term of such lease before the commencement of the case under this title**, and ceases to include any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease during the case; (Emphasis ours).

---

[2] The letter dated October 31, 2017, was sent to the email address of the Tenant as indicated on the Lease.

The court in <u>In re Southcoast Express, Inc.</u>, 337 B.R. 739 (Bkrtcy.D.Mass., 2006) held that the phrase "terminated at the expiration of the stated term," as used in section 541(b)(2) is broad enough to include not just temporal expirations but an expiration under the terms of the lease. The court concluded that to determine whether debtor's lease was terminated pre-petition by the expiration of the stated term, the court had to look to state law to determine when the lease was terminated, as opposed to just looking to the end date of lease. Moreover, <u>In re Policy Realty Corporation</u>, 242 B.R. 121 (S.D.N.Y. 1999) aff'd 213 F.3d 626 (table), 2000 WL 534265 (2nd.Cir.2000) examined sections 541(b)(2) and 365(c)(3) and held that the pre-petition accelerated termination by default notice and subsequent termination notice, in accordance with the terms of the lease, constituted the expiration of the stated term. It further stated that because the lessee had no continuing property rights under the applicable state law at the time it filed for relief, no interest of the lessee in the lease could become property of the estate. A lease contract that is validly terminated pursuant to state law may not be resurrected by the filing of a bankruptcy petition. <u>In re Santos Borrero</u>, 75 B.R. 141 (Bkrtcy.D.Puerto Rico, 1987). The cases from the First Circuit favor looking to state law to determine when the lease was terminated as opposed to looking to the end date of the lease.[3]

---

[3] <u>In re Tiny's Cafe, Inc.</u>, 322 B.R. 224, 226 (Bankr.D.Mass.2005) ("Under Sections 362 and 541 of the Bankruptcy Code, a lease that has been terminated for non-payment prior to the filing of bankruptcy is not property of the estate, and is thus not protected by the automatic stay."), <u>In re T.A.C. Group, Inc.</u>, 294 B.R. 199, 202 (Bankr.D.Mass.2003) (examining state law to determine effectiveness of landlord's pre-petition termination for purposes of 11 U.S.C. §§ 362(b)(10) and 541(b)(2)), <u>In re Gromyko</u>, 142 B.R. 20 (Bankr.D.R.I.1992) (granting relief from stay as landlord terminated lease prepetition), <u>In re Norwood Aviation, Inc.</u>, 47 B.R. 155 (Bankr.D.Mass.1985), aff'd <u>Bevilacqua v. Boston Metropolitan Airport, Inc.</u>, 63 B.R. 68 (D.Mass.1986) (granting relief from stay as landlord terminated lease pre-petition and citing for support § 541(b)(2)).

The court now turns to the laws from the Commonwealth of Puerto Rico which govern contracts. Article 1042 of the Puerto Rico Civil Code, 31 L.P.R.A. § 2992, states that obligations are created by law, by contracts, and quasi contracts, and by illicit acts and omissions in which a kind of fault or negligence occurs. Obligations arising from law are not presumed, and the provisions of the laws, which may have established them, shall govern them. 31 L.P.R.A. § 2992. Article 1044 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 2994, states that "[o]bligations arising from contracts have legal force between the contracting parties, and must be fulfilled in accordance with their stipulations." 31 L.P.R.A. § 2994. It is for this reason that courts may not relieve a party of its obligations to do whatever it was agreed to do by contract, provided said contract is legal, valid and without defect. Cerveceria Corona v. Commonwealth Insurance Co.,115 D.P.R. 342 (1986); Hennes v. Sun Life Assurance Co. of Canada, 291 F. Supp. 670 (D.P.R. 1968); Matricardi v. Peñagarícano, Admin., 94 D.P.R. 1 (1967); Clausells v. Salas, 51 P.R.R. 87 (1937).

Article 1210 of the Civil Code establishes that "[c]ontracts are perfected by mere consent, and from that time are binding, not only in regard to the fulfillment of what has been expressly stipulated, but with regard to all consequences which according to their character, are in accordance with good faith, use, and law." 31 L.P.R.A. § 3375. A contract is in existence between two parties when the following conditions are met (1) the consent of the contracting parties; (2) a definite object which may be the subject of the contract; and (3) the cause for the obligation, which may be established. See Article 1213 of the Civil Code, 31 L.P.R.A. § 3391. Once the essential conditions required for their validity exist, contracts shall be binding between the parties. See Article 1230, 31 L.P.R.A. § 3451.

As stated, contracts are perfected by mere consent, and from that moment each of its parties is obliged, not only to fulfill what was expressly agreed to, but also to respond to the consequences that, depending on its nature, conform to good faith, the use, and the law. Vélez López v. Izquierdo Stella, 162 D.P.R. 88 (2004); Article 1207 of Puerto Rico Civil Code, 31 L.P.R.A. § 3372; Municipio de Ponce v. Rosselló, 136 D.P.R. 776 (1994); Unisys v. Ramallo Brothers., 129 D.P.R. 13 (1991); Producciones Tommy Muñiz v. COPAN, 113 D.P.R. 517, 526-27 (1982). The parties are bound to comply with that which was expressly agreed. Article 1210 of the Civil Code, 31 L.P.R.A. § 3375.

Article 1207 of the Civil Code, 31 L.P.R.A. § 3372, contains the concept of freedom to contract ("libertad de contratación"). This concept implies that the agreements in which parties can enter to are essentially limited to their imaginations, thus leaving the will of the parties as the supreme law between them. Arthur Young & Co. v. Vega, 136 D.P.R. 157, 169-170 (1994). However, the will between the parties is not completely unlimited. As such, "[t]he contracting parties may make the agreement and establish the clauses and conditions that they deem advisable, provided they are not in contravention of law, morals or public order". 31 L.P.R.A. § 3372. In sum, the contractual provisions of the Lease defined and controlled the legal relationship between Mr. Medawar and Debtor.

Still more important for this particular case, the courts of justice cannot relieve one party of fulfilling what it obliged itself in a contract, when the contract is legal and valid, and does not contain any vices. García v. World Wide Entm't Co., 92 J.T.S. 177, 10264 (1992); Constructora Bauzá v. García López, 91 J.T.S. 99, 9076 (1991).

-6-

Debtor argues that Mr. Medawar unilaterally terminated the Lease and cites Andreu v. Popular Leasing, Inc., 184 D.P.R. 540 (2012) and Article 1208, 31 L.P.R.A. § 3373, as support.[4] This case is inapposite to the issue at hand, and Debtor misconstrues and misapplies the purpose of Article 1208 for its benefit. Andreu Fuentes dealt with the lease of a vehicle, which the Supreme Court of Puerto Rico described as a type of lease agreement where one party, the lessor, purchases a vehicle from a seller and then leases the same to a third party. In Andreu Fuentes, Mr. Andreu (the third party lessee) signed receipts and releases acknowledging that he would still be responsible for all the monthly payments even if the vehicle suffered damages or was lost. Thereafter, lessee Andreu unilaterally cancelled the lease agreement after the vehicle was not operating correctly, going against the letter of the agreements he had signed with Popular Leasing. A fact pattern quite dissimilar to the one before this court.

Similarly, Article 1208, which states that "[the] validity and fulfillment of contracts cannot be left to the will of one of the contracting parties", protects a party from the will or whim of the other parties. In other words, in contracts, where the obligations are reciprocal, one of the parties cannot elude compliance therewith. Hoffman v. Cuadrado, 14 P.R.R. 573 (1908).

Debtor further argues that Mr. Medawar's reliance on "clause #20 of the contract" to justify the termination of the Lease is prohibited by Article 1207 and 1208 of the Civil Code of Puerto Rico. Debtor reasons that these two Articles explicitly condemn the proceeding that creditor tried to use to terminate the contract in order to subrogate himself in the place of Debtor in Debtor's business contracts, which represented more than $150,000.00 from the lodging

---

[4] In addition, Debtor makes a passing reference to the $12,000.00 Mr. Medawar received as a rental deposit upon the signing of the Lease. Debtor maintains that Mr. Medawar's bad faith is evident by his failure to use this deposit to cover the rent payment owed in October 2017. Given the clarity of numbered paragraph 4 which states in relevant part: "Tenant shall not use the Security deposit in lieu or as an advance of payment of rent", the court will not address this argument further, as it has no legal merit.

-7-

contracts obtained by Debtor. This, Debtor contends, is an act of bad faith and by itself shows that Mr. Medawar was trying to benefit from all the efforts of Tenant, and that the Lease should be interpreted taking into consideration Mr. Medawar's bad faith and intention to steal Debtor's moneys. This court disagrees. Notwithstanding the fact that clause 20 of the Lease is valid and had the effect of protecting and guarantying Debtor's possession, Mr. Medawar did not rely on clause no. 20 to terminate the Lease.[5] Mr. Medawar relied upon the terms of numbered paragraphs 5 and 7 of the Lease in order to terminate said contract. Numbered paragraph 7 of the Lease is clear in its terms. An email was sent to Debtor, as per the notice provisions of the Lease, on October 23, 2017, requesting that payment of the October 2017 rent be made by that same date. The Lease does not require that any particular language be used for this request. Eight days later, on October 31, 2017, another notice was sent to the Debtor terminating the Lease pursuant to the language in numbered paragraph 7. Mr. Medawar's purported intent, as alleged by Debtor, to take over profitable opportunities, is not relevant to our analysis. Debtor defaulted under the explicit terms of the lease, and as such, Mr. Medawar was within his legal right to terminate said Lease under its terms therein.

The validity of the termination of the Lease having been determined, the court now considers Debtor's last argument which invites the court to examine the Lease under the r*ebus sic stantibus* doctrine. Under Puerto Rico law, this doctrine is a clause deemed implicit in contracts and serves to adjust a debtor's obligation or rescind the contract when unforeseeable circumstances render strict compliance with the contract unfair. See Rodríguez–López v.

---

[5] Numbered paragraph 20 of the Lease states:

20. Current Property Loans: Landlord shall continue to be current on his loan payments secured by the property, if any, throughout the lease term.

Municipio, 75 D.P.R. 479, 491–492 (1953) (explaining that the *rebus sic stantibus* doctrine represents one of several approaches in Spain to the notion that contracts may be altered because of a change in the circumstances in which they were engendered, and stating that per such clause, presumed implicit in all contracts, a contract could be rescinded if there was an important change in the facts, such that if the contract were allowed to remain unaltered the result would be unfair and excessively costly). Because it allows for an attenuation of that which is required of the parties under a contract, the *rebus sic stantibus* doctrine stands as a counter force to the rule embodied by the *pacta sunct servanda* axiom, set forth in Art. 1044 of the Civil Code, 31 L.P.R.A. § 2994 which states: "Obligations arising from contracts have legal force between the contracting parties, and must be fulfilled in accordance with their stipulations". See Casera Foods, 108 D.P.R. at 854.

The *rebus sic stantibus* doctrine is not specifically regulated by the Puerto Rico Civil Code. See Casera Foods,108 D.P.R. at 853. (neither the Spanish nor the Puerto Rico Civil Code contain a provision explicitly regulating the use of *rebus sic stantibus*). Nonetheless, the Puerto Rico Supreme Court has stated that the *rebus sic stantibus* doctrine may apply as an exceptional remedy to extraordinary circumstances. Id. at 857, Municipio de Ponce v. 292 Autoridad de Carreteras, 153 D.P.R. 1, 36 (2000) (citing Casera, supra). Its application, however, is conditioned on the presence of all of the following elements:

(1) The unforeseeable event has arisen;

(2) as a result thereof, there be an extraordinary difficulty or aggravation of the conditions surrounding the concession to be made by the debtor, so that it becomes significantly more costly for him to comply with his obligation;

(3) the contract does not have a random nature or of pure speculation, with which the parties wanted to foresee in a certain way, the possibility of the event;

(4) the parties' actions be free of deceit, since there are other mechanisms to attend that problem;

(5) the contract is of successive tract or is related to a future moment, so that it has a certain duration;

(6) an unforeseeable circumstance arise, it also being necessary that such a circumstance show some signs of permanence; and

(7) the interested party move the court for relief.

Casera, 108 D.P.R. at p. 856

For the application of the rebus doctrine to proceed, it is essential that all 7 requirements be met. Failure to comply with one of them prevents the revision of a contract through the application of the *rebus sic stantibus* legal norm, as it is an exceptional remedy that requires prudence and moderation when imposed. Municipio de Ponce, 153 D.P.R. at 36 – 37.

Debtor's premise is that the court should view Mr. Medawar's actions to appropriate Tenant's produced moneys as a violation of equity and together with the doctrine of *rebus sic stantibus* and force majeure conclude that the Lease is part of Debtor's Estate. To buttress this assertion, Debtor argues at length that Hurricane Maria, which made landfall in Puerto Rico on September 20, 2017, was specifically the type of monumental event to trigger consideration under the *rebus sic stantibus* doctrine. Debtor's extended hyperbole aside, the court agrees that Hurricane Maria was a remarkable meteorological phenomena, severe in its scope, but not altogether unexpected given Puerto Rico's geographic location and indeed not the cataclysmic event recounted in Debtor's motions. The Supreme Court of Puerto Rico has held that some natural phenomena, such as hurricanes, can be reasonably anticipated. De la Cruz v. Toro, 112 D.P.R. 650, 657 (1982). Moreover, the Puerto Rico Court of appeals has decided "experience and general knowledge of the situation in our environment allows us to conclude that the passage

-10-

of a hurricane is a foreseeable eventuality for the municipalities of Puerto Rico. These occurrences do not reach the degree of unpredictability and onerousness necessary to justify the resolution of a contract under the doctrine of rebus sic stantibus." <u>Municipio de Gurabo, Demandante-Recurrido v. Municipio de Guaynabo, Demandado-Peticionario</u>, 203 WL 21960835 (2003). Because the *rebus sic stantibus* and force majeure doctrines are applied in exceptional cases and in extraordinary circumstances, it does not apply here since we are not facing an exceptional situation. At this juncture, the court deems it unnecessary to analyze whether the remaining requirements of the *rebus sic stantibus* clause are met. Because the circumstance that Debtor claims was unforeseeable has no such character, Debtor cannot seek to benefit from *rebus sic stantibus* doctrine's exceptional relief.

### CONCLUSION

The Lease, which this court finds was legally binding under state law, and legally terminated on October 31, 2017, is not property of the Debtor's estate pursuant to 11 U.S.C. § 541(b)(2). Therefore, the Debtor and Medawar shall coordinate a date within the next ten (10) days for Debtor to surrender and vacate the premises.

SO ORDERED

San Juan, Puerto Rico, this 24th day of January, 2018.

Brian K. Tester
U.S. Bankruptcy Judge

-11-